Good morning. Good morning. May it please the Court, my name is Gerson Marsibia. I represent the Petitioners, SSA Terminals and Homeport Insurance Company. At this time I'd like to reserve three minutes of my time for rebuttal. I'll try to keep track of my time. There are two issues before the Court today. The first is when does the statute of limitations under Section 13A of the Longshore and Harbor Workers Compensation Act begin to run? And the second issue, which is brought by the Cross Petitioner, the claimant is, was the nature of his disability temporary or permanent at the time of his retirement? On the first issue, it is Petitioner's contention that the Administrative Law Judge's finding as affirmed by the Benefits Review Board that his claim for compensation benefits was timely. Counsel, I'm having some difficulty hearing you. Oh, sorry. I'll speak up. Okay, thank you. You can just move the microphone a little closer. Yeah, that helps. There we go. Is that better? Yes. Sorry. It is Petitioner's contention that the Administrative Law Judge's finding that the claimant's claim for benefits under Longshore Act as affirmed by the Benefits Review Board was unsupported by the appropriate legal standard. It wasn't in accordance with law, nor was it supported by substantial evidence. Here, the Administrative Law Judge found that the claimant's March 2008 claim for compensation had stopped working for us, let's say, approximately five and a half years prior to when he filed the claim. The Administrative Law Judge further found that the statute of limitations did not begin to run until some six months after the claimant had actually filed his claim in September of 2008. The judge reasoned that the claim for benefits did not begin to run until the claimant was aware of the medical relationship between his employment with SSA and his injury. So specifically, he needed a medical report that tied his work activities with SSA with the worsening knee pathology that he was experiencing. But did he need a medical report to become aware that his injury was associated with his former employer? Why would he need a medical report to tell him that? He would not. Our position is that he does not. And specifically on the record here, the claimant had tied his worsening subjective complaints with his employment with SSA. There's a number of citations to the record. So you disagree with the finding. We do disagree with the finding. So what is there in the record that would support your argument that even without a medical report, the claimant should have been aware that his disability was tied to his former employer? So the record is complete with a number of examples. I'll point the Court's direction to ER 86. I'll be citing two Petitioner's excerpts of records. On that page, the claimant testified that certain activities at work, such as kneeling, bending, stooping, climbing, all increased his right knee pain while he was employed by SSA terminals. But how would he relate that? Was SSA the former employer, the first employer? No. That was Mattson terminals. Okay. So but isn't Mattson the one that he's — okay. I'm confused. He's trying to make SSA the — The responsible one for his compensation benefits. Uh-huh. Okay. And this claim only comes down to compensation benefits. Right. We're not disputing medical benefits here. But he keeps getting paid by Mattson for a long time. So, I mean, I think what they were saying is that common sense, he thinks, well, that must be the basis for my claim. Well, Mattson was paying his medical treatment. Sure. But what we're looking at is a — We're lawyers, and he's not. What we're looking at is a claim for compensation benefits. Right. And Section 13 provides a specific statute of limitations for compensation claims. Right. And once the claimant has the requisite knowledge under Section 13, the claim accrues. And that requisite knowledge is that he has an awareness of an injury, that the injury is related to his work, and that the injury results in an impairment of earning power. But he has to know which employer. Yes. It has to be linked. That's the part that I'm — Yes. — focusing on. It has to be linked to a particular employer. Not just he has an injury that is related to work, but it has to be related to work with a specific employer. Yes. And here he had tied his specific work with SSA to his disability and his decrease in earning power. At what point? At what point in the record are you looking to say that he tied his disability into his work with SSA? That would be at the time of retirement, which was in February of 2002. He actually reported to his treating doctor in March of 2002, right after he had retired, that he had been forced to do increased work at SSA terminals. And that increased work, which was due to personnel changes, had caused him to undergo — I'm sorry. It caused him to experience increased pain about his right knee. Where is that in the record? That would be at ER 408. Okay. And his treating doctor had actually told him that retirement will actually help his knee symptoms. And Mr. Carrion had testified that his retirement — he had planned to retire at the age of 65, but because of his increasing knee pain, he was forced to retire at the age of 57. And throughout this period, he's still receiving medical benefits? Somewhat. It's yes and no. Sporadically. Yes, because he had actually seen his doctor a month after his retirement, and had believed Mattson paid for that treatment. Yeah. I mean, I think that was up through, like, 2006, right? So there was no treatment from that March 2002 examination to 2006. Right. And then he gets paid. I think it was authorized, but that visit wasn't paid by Mattson. Okay. That's what prompted the whole thing. But then at that point, then he figures out, well, actually he has a — you know, it's not a site-specific injury, so to speak. It's this cumulative effect. Yes. Which is different. Yes. But his claim for compensation benefits accrued at the time of retirement because he was fully aware of the injury would have to say that — his work would have to say it resulted in increased pain, and that that increased pain was due to specific work activities for SSA. And also that that increased pain is what caused him to retire and stop working. So are you asking us just to disagree as a matter of fact, or is your argument that it's a matter of law? It's both, Your Honor, because — It's both? Yes. Because here the administrative — Well, maybe you only get one. I'll get both. Well, here the administrative law judge found that he needed to have an awareness of the medical relationship between his work and his injury. And that's not the correct legal standard. That's not required. What do you say is the correct legal standard? It's simply awareness. He could be subject to — Awareness of what? That his work is causing him an injury, which in this case is pain. But that's been true for virtually all of his work life. How does he — again, we're lawyers. He's not. How does he tie work to my most recent employer if he's been working in this — with this pain forever? Well, what Section — well, what Section 13a provides is that the claimant needs to be aware of the relationship between his work and his injury. And an employer. He has to be able to tie it to a particular employer, not just his — globally his work. I don't think it actually requires that, Your Honor. Section 13 says that if he — let me state what this Section 13 standard is, is that the statute of limitations doesn't begin to run until the claimant is aware or by the exercise of reasonable diligence should have been aware of the relationship between his injury and the employment. It doesn't say — The employment. The employment. Not just employment. So the employment implies a particular employment. Well, and here he did have that awareness. He had tied his worsening knee pain, which caused him to retire with his work with SSA Terminals. What do you — what do we do with the, at least, skit more deference that we give to the position of the director of the Office of Workers' Compensation Programs? Because it appears that the position of that office is in conflict with your position. What do we do with that? In this case, it's our position that the director's litigating position isn't entitled to any deference, not even skit more deference, because this isn't an interpretation of the act or a regulation, but rather a factual analysis to the legal standard that has been applied by this Court. Would the remainder of — Where the director took a contrary position on similar facts, substantially similar facts. I'm not sure if there's any case with substantially similar facts to this one, Your Honor. It's a very unique case. Okay. With the remainder of the time I have, I'd just like to briefly touch about the nature of this ability argument. Its position is contention on this issue. The administrative law judge is finding that the condition was temporary at the time of substantial evidence. None of the medical experts in this case found the condition to be at maximum medical improvement. And all the medical experts agree that the claimant was in need of a total knee replacement to improve his condition, and they all agreed that the total knee replacement would help Mr. Carrion's condition once he had the surgery. That just seems like such an odd construct to me that — I mean, if you are disabled, if he didn't plan to have surgery — they kept talking about, well, he planned to have surgery, but if he didn't plan or something happened or he has a heart condition and he can't have surgery, is he somehow transformed? And that seems to me at odds with how you define temporary and permanent. I just don't understand how a contingency in the future changes the fixation of your disability. Well, I agree, Your Honor, and — You agree with what? I agree that in this case it wasn't necessarily a contingent surgery. He was a candidate for knee replacement surgery as of 2000, the year 2000, because his condition was bone on bone at that point. Right. So it was essentially up to him to have the surgery once the subjective complaints were to the point that he could no longer take it. So he could have had that surgery in 2002. I know, but you can't — so it is a contingency of having the surgery. Well, there's nothing in the record that indicates that he wasn't going to have the surgery. Well, but why would it matter? That's what I'm having some trouble understanding, because what if in the end he doesn't have the surgery? Or what if the surgery isn't effective? Well, in this case — Then you would reevaluate, I guess. Oh, would you? And in this — but in this case, it looks like all the medical experts agree that the surgery would have actually improved his condition to a state that it would be better than it was at the time of retirement. I know, but that — you know, just walk into any orthopedic shop, and they'll be looking at re-dos of knee surgery that didn't turn out so well, you know, was not, as they say,  Now, malpractice does not expect good results. So, you know, I just am having some trouble from a legal standpoint figuring out why he either is temporarily disabled or he's permanently disabled. And if he is permanently disabled, it's possible if he went and got the surgery, then you would reevaluate, correct? That's true. So why wouldn't he, during the period when he is actually permanently disabled up until when he does or does not have the surgery, and it turns out well, why isn't he permanently disabled? Well, in this case, what's missing is we don't know what the normal period of healing is for this injury. There's nothing in the record that indicates that, because this court, as the Watson court, distinguished between a condition that's of a lasting or infinite duration as opposed to one that awaits a normal healing period. But that's if he has the surgery, though, right? But before he has the surgery, we're not talking about a normal period of healing. True. He's kind of stuck. I mean, he is what he is at that point. It's not going to get any better. Time won't make him better. Is that agreed? Well, actually, the treating doctor, when he retired, thought that his subjective complaints would actually improve following retirement. So if you considered a cumulative trauma injury up to the date of retirement as an aggravation and an injury, then there was a normal period of healing following the retirement that had to occur before he could be deemed permanent. Did you want to save your remaining time for rebuttal? Yes, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Matthew Boyle on behalf of the Director, Office of Workers' Compensation Programs. Your Honors, I'll start with the timeliness issue, which is pretty straightforward. Section 13A of the Longshore Act says that a claimant's time does not begin to run until he is aware or should be aware of the relationship between his injury and his employment. Now, that is a statutory standard, obviously, but whether he knew or whether he should have known is a factual determination for the ALJ. And what the ALJ reasonably found here is that Mr. Carrion didn't know and shouldn't have known of the relationship between his injury with SSA, of his injury and his employment with SSA until 2008, because that was the first time that anyone told him that he had actually experienced an injury with SSA. That was in Dr. Stark's report of September of 2008, when Mr. Carrion was told for the first time that his employment with SSA had aggravated his earlier injuries and caused cumulative trauma. Until Dr. Stark told him that, the ALJ found that Mr. Carrion believed that his disability was related only to his employment with Mattson, which was a perfectly reasonable belief for a claimant to hold, given that he had had two traumatic injuries, two traumatic compensable injuries with Mattson, and that Mattson had continued to pay his medical, for his medical treatment, not only while he was employed with SSA, but for five years after he retired from SSA in 2002. Counsel, go ahead. No, please. Isn't your position that until there's a medical opinion linking the injury with a particular employer, there is not reason to know of the linkage? Not necessarily, Your Honor. Just that in this case, this was the first time that Mr. Carrion was made aware of this. In other cases, I think a claimant could be made aware through other means. In this case, however, Mr. Carrion wasn't. He wasn't even told that he was getting cumulative trauma while he was with Mattson. He was with Mattson for 30 years. He simply didn't know, as a layman, what cumulative trauma was. He assumed, I injured my knee with Mattson. I mean, if I injured my knee in high school sports, and every once in a while it acts up, I don't think to myself, wow, I'm having a cumulative trauma today. I think, wow, my sports injury is acting up. And that is what Mr. Carrion thought. Well, Mr. Stibius said, if you really look at the time he retired, he was told that, in fact, his work at SSA exacerbated his injury. He wasn't told that, Your Honor. So the reason he said he retired was because he was having increasing pain. But this Court and the Board have both held that increasing pain alone, as a matter of law, is not sufficient to give one notice that there is a continuing injury. So that sort of defeats the pain is enough argument. Going along with that, the ALJ found that Mr. Carrion reasonably believed that that increasing pain related back to his 1987 and his 1994 injury with Mattson. Do you agree with opposing counsel that your presentation in this case is merely a litigating position, which is not entitled to any deference? I don't, Your Honor. But I also, for the most part, don't think it matters very much. The timeliness issue is basically a factual determination that the ALJ made, saying, based on the facts that are before me, there's no way that Mr. Carrion knew or should have known as a layman that he had an injury with SSA. And what's our standard of review? Well, as to this factual determination, Your Honor, it's substantial evidence. As to our interpretation of Section 13A, I think we do deserve skid more deference. Oh. I will move on. Does this Court have any other further questions about the timeliness issue? No? Okay. So you say that we should give you skid more deference in terms of your interpretation of the statute. Why is this not just a litigating position for you? Well, Your Honor. Are there any published opinions on this from the Director's Office? Is there anything we can look to to refute the argument that this is just a litigating position? Probably not, Your Honor. Okay. I will move on to the second issue, which is when Mr. Carrion's disability became permanent and specifically whether it was permanent at the time of his retirement in 2002. And the answer to that question lies in the case law, Your Honors. The case law says that a disability changes from temporary to permanent when the employee reaches maximum medical improvement. And maximum medical improvement is the point at which normal and natural healing is no longer likely to occur. A claimant can also be permanent if his disability appears to be a lengthy period or a lasting or indefinite duration. How are you defining normal and natural healing? How are you defining that? Well, what the case law basically says, Your Honor, if the claimant's condition is improving, if there is a prospect of it improving. Does that include with the assistance of surgical procedures?  Okay. So what is your position, what is your response to opposing counsel's argument that there was not permanency until after the surgery that was contemplated? Well, what the case law says, Your Honor, is that if there is a surgery imminent, then the person can be considered to be temporary until that surgery has occurred and until the recovery period after that surgery, and then it can be re-evaluated. There was no surgery imminent here in 2002. In fact, Dr. Caldwell specifically said you should not have the surgery now because it won't help your functioning and essentially replacement knees only last so long. Do we need a special rule for joint replacements? I don't think so, Your Honor. So if he had scheduled surgery already, your position would be slightly different? You would say we'd have to wait? I think if on the day of his retirement in 2002, the doctor had said we're going to do surgery in two months or a month because your knee is shot and it's not going to improve, this is going to improve your functionality, then, yes, I think he could be considered temporary for that period of time and until he recovered from the surgery. In this case, however, there was no surgery. And is there any definition of what imminent or how long this temporary status would last from the case law? I mean, the case law is the one month that I just came up with is the Board's Walker decision. The Edwards case out of the Board said where the claimant had three knee surgeries in two years and his condition was improving by 50%. The Monta case was not a surgery case, but it said where the claimant was having pain management and his condition was improving over the course of the year until that treatment was over. But I think it's ongoing or planned treatment that makes the difference. I had another question about positions he had taken before the ALJ. He made alternative arguments, and he said that he hadn't actually, the knee condition hadn't reached the maximum medical improvement as an alternative argument. What does that do to the argument you're making now that, in fact, this was permanent? I don't think it really does anything, Your Honor. I mean, he made both arguments. The ALJ ruled one way or the other. The ALJ addressed temporary and permanent in the decision. It was before the Board. The Board addressed it. I don't think it really affects the outcome at all. I'm going to cede the rest of my time. Before you leave, closing counsel had directed us to page 408 of the excerpts of record where he says that Mr. Carrion told Dr. Caldwell that he was getting more and more symptomatic at his present job because his work had laid off, I'm assuming, a bunch of personnel, and he had to do some extra work. And he says that this statement evidences the fact that he was aware that his present work was responsible for his. I don't think it does, Your Honor. Why not? Because, again, that just goes to his pain. His symptoms were essentially pain. And the Court has already said that pain does not give you an indication that there's a continuing injury. Even increased pain doesn't? No, not at all, Your Honor. Okay. What case is that you're. . . M. Martinek v. Shipbuilding v. The Director, which is 900 F. Second, 180. And also the board. . . Is that a Ninth Circuit case? Yes, it is, Your Honor. And there's also a board case, Lopez v. SSA, 39 BRBS 95. All right. Thank you, Your Honor. May it please the Court. I am Joshua Glellen, appearing on behalf of Mr. Carrion. I join, of course, everything that has been argued on behalf of the Director. We fully agree with the Director on both points, as the Director fully agrees with us on both points. If I might add one thing to my brother Boyle's final answer, I think the critical distinction between permanent disability and temporary disability has got to relate to disability, not medical condition. If we have a claimant whose spine has been severed and who is — has no history of any work except manual work in the past, that claimant is virtually certain to be permanently totally disabled. They're not going to be returnable to employment. They're going to be bedbound, in fact. But their current condition may involve intractable pain for which surgery is expected to improve their condition. Yes, they will get better. Yes, they will be in treatment. Yes, they will have a period of recuperation from that surgery, but the outcome of that treatment and that healing period is not going to be the least amelioration of the disability. And if what we're trying to determine is not whether the physical condition, the overall condition, is temporary or permanent, but whether the disability is permanent, the question answers itself. That claimant is not going to be returned to employability by that treatment and recuperation period. So the disability remains permanent despite the fact that that treatment is undertaken. I'm having some trouble with that argument because I understood your colleague and everyone else to say if you did have surgery and things turned out well, you might actually change the determination on disability. Is that not true? Not in this case, no. There's not the least evidence that ---- No, I'm just saying, let's say he had the surgery tomorrow, and it's like amazing, and he runs out of the hospital, you know? Wouldn't they reevaluate? Absolutely. Okay. There is always under this statute, the decisions, at least if the decision makes an award, is never final. That award is always subject to modification based on the change in condition. It's just that the way you were describing it sounded like, you know, you were down for the count. Once you got the permanent disability, it could never be revised. Oh, no. It always can be revised if it turns out, contrary to the expectations, that the claimant does become employable again. Absolutely. Okay. But if the treatment is not expected to return, to result in any amelioration of the disability, of the ability to earn, then the disability is permanent, even though the condition is not. How would you apply that in this case? Because if he ran out of the hospital with a new knee, he could go back to work. Well, two points. First, the analysis of permanency or temporariness of Mr. Carrion's disability has to be judged initially by what that condition was in 2002, when he retired. And at that point, there was — I have to correct or clarify something my brother Sibbia said, which is that there — well, first, that there was no treatment between 2002 and 2008. That's not quite true. It's true in the sense that there was no actual treatment proposed. But Mr. Carrion continued to have to see his doctor and had annual reevaluations of his knee each year between 2002 and 2006. And those were the bills that the previous employer, Mattson, continued to pick up. Pain meds in there? Yes. Pain meds were regularly re-prescribed each year. Counsel, do you share your colleague's view that JM Martinez stands for the proposition that pain in and of itself is not sufficient to put a claimant on notice of injury? I remember that case rather well. I was involved in it and was sitting in Mr. Boyle's seat at the time. Okay. So would you tell me specifically the language in JM Martinez that precludes reliance on pain as an indication of injury at a particular employment? I can't and I wouldn't actually go so far as to try to support quite that proposition. I thought that was the proposition he cited it for. Well, I think that the key distinction is between a claimant who knows he has an underlying condition, which he has here been told to expect will get worse. He knows his knee is a mess. Every day he goes to work, his knee hurts. Every exertion on the weekend, his knee hurts. He comes back from work every day and has to ice his knee. He knows perfectly well that he has an underlying derangement of that knee. He's been told to expect that it is going to get worse by natural progression. And that, I think, is the key that saves this case from any possibility of a time limitation barring him, apart from the fact that lay people do not understand the whole concept of cumulative trauma as an injury. So I don't think any worker under the Act should be charged with recognizing that they have sustained an injury by just performing their duties with no identifiable traumatic event. But in this case, we don't even have to go so far as to say that that's not enough to make you aware of an injury, because he had been told to expect that his condition would deteriorate over time, and therefore, of course, if he continued to work, his knee was going to hurt more and more. So the fact that he knew his knee was hurting more and more with that work did not make him reasonably aware that it was the work that was causing further degeneration of the knee. He only knew it brought on more and more pain as time went on. And therefore, that his knee condition was getting worse and worse, but he had reason to understand, reason which was bolstered by Mattson's continuing to pay his medical bills, that this was the natural progression of the arthritis set in motion by that traumatic injury all the way back in 1987 and again in 1994. Thank you very much. You have some time for a rebuttal. The first thing I'd like to do is clarify something that my colleague, Mr. Gillelan, said, which is that Mr. Carrion continued to have yearly medical appointments between 2002 and 2006. I'll direct the Court's attention to ER-408. At the bottom, there's a report from August 17, 2006, where the doctor states, I have not seen this patient for four years. As to Judge Rawlinson asking about the J.M. Martinique case, what the Court in that case was talking about when they talked about an awareness of pain is not an awareness of an injury. They were talking about in terms of Section 13's requirement that the claimant have an injury that impairs his earning power. So just simply being aware of pain, of course, does not tell someone that they are suffering an injury that resulted in earning impairment. Here, what Mr. Carrion had was an increase of pain that caused him to retire, and thus he had the requisite awareness of an impairment of earning power. That case was talking about like an initial diagnosis. If you're suffering pain, but nobody's told you your pain is caused by a particular medical condition. Correct. And here, he had known that his knee pain, you know, was caused by his work. He had tied it to his specific activities. It got to the point where he had to retire early. And thus, he had the impairment of earning power as required by Section 13. Thank you. Ginsburg. I'd like to thank all counsel for your arguments. It's really a pleasure to have lawyers when all of you are so well-versed in this particular area and so familiar with the law. So we appreciate it. The case just argued SSA Terminals v. Carrion, I guess it is, as submitted, and we're adjourned for the morning. Thank you. All rise. This court for this session stands adjourned.
judges: McKeown, Rawlinson, Davis